UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA					CASE NO. 18-cr-00227

VERSUS								JUDGE FOOTE

DEMYIA S. PORTER (01)						MAGISTRATE JUDGE HORNSBY
NAQUITA N. GRAVES (02)

## REPORT AND RECOMMENDATION

**Introduction**

Demyia S. Porter and Naquita N. Graves are charged with conspiracy to distribute controlled substance and possession with intent to distribute cocaine. The charges arise out of a traffic stop on I-20 in Webster Parish, Louisiana. Before the court are Defendants' Motions to Suppress (Docs. 32 and 33). For the reasons that follow, it is recommended that the motions be denied.

**Relevant Facts**

The testimony at an evidentiary hearing together with the audio/video recording of the traffic stop, established the following facts. On August 20, 2018, Louisiana State Trooper Christopher Perry was on stationary patrol on I-20 in Webster Parish. A car approached him, and he noticed that it was traveling more slowly than the traffic around it. Trooper Perry let the car pass him, waited approximately one minute, then pulled out to follow the car.

As he caught up to the car, Trooper Perry ran the license plate to identify the owner. He saw that there were two people in the car, the driver and a passenger. He also saw the car move onto the solid white fog line on the right-hand side of the interstate. He notified dispatch that he was making a traffic stop, and he ran a check of the license plate on the car. Perry learned the vehicle was a rental car. He then activated his emergency lights to conduct the traffic stop.

When Trooper Perry initiated his lights, his car's dashcam automatically turned on. The camera backs up a period of about 30 seconds before the lights are activated. The violation that precipitated the traffic stop is not on the video because it happened before that 30 second time frame. However, Trooper Perry is heard on the video saying that an improper lane use violation had occurred.

After stopping the vehicle, Trooper Perry spoke with Porter, the driver. Trooper Perry testified that Porter appeared nervous because Porter would not look at him and looked away when Perry asked direct questions. Porter said that he lived in Houston. He told Trooper Perry that Graves (the passenger) rented the car for about a week and came to Houston from Mississippi to pick him up.

Trooper Perry then questioned Graves, the passenger, who said that another friend had rented the car for her the day before as a birthday present. Graves said that she and Porter both live in Mississippi. She said that they drove together from Mississippi to Houston the day before to eat dinner at Pappadeaux's for her birthday. She said that they were on their way back to Mississippi. While speaking to Trooper Perry, Graves called

her friend to get a copy of the rental agreement, which showed that neither Porter nor Graves rented the car, and neither was an authorized driver on the rental agreement.

Trooper Perry noted several factors that made him suspicious that Porter and Graves were involved in criminal activity. The car had been rented by a third party. The defendants were traveling from Houston, a known narcotics source city. The car was very clean and had only a Pappadeaux's doggy bag in the backseat. The Defendants' stories about where they lived and why they were traveling were totally inconsistent, and Porter appeared unusually nervous when speaking with the trooper.

Trooper Perry returned to his vehicle to run the driver's license and criminal background checks for Porter and Graves. Porter's background check yielded an extensive criminal history that included shoplifting, domestic violence, simple assault, grand larceny, accessory after the fact, and traffic violations.

Perry requested backup so that he could ask for consent to search the vehicle. Trooper Matt Titus, a canine handler, arrived. Trooper Perry then asked Porter for consent to search the vehicle. Porter consented to the search and signed a state police consent to search form. Gov. Ex 2. Trooper Perry conducted a search of the car and found $2,647 in cash in Graves' purse and approximately 10 kilograms of cocaine in a suitcase in the trunk of the car.

Porter and Graves were then placed under arrest. Trooper Perry read them their Miranda rights, and they indicated that they understood. Gov. Exs. 3 and 4.

**Defendants' Motions to Suppress**

Porter and Graves both argue that the traffic stop was an illegal seizure under the Fourth Amendment and, therefore, all evidence seized as a result of the illegal traffic stop should be suppressed. Graves also argues that the rental car never traveled on the white fog line and, even if it had, it would not necessarily be a violation of La. R.S. 32:79. She contends that the evidence does not support the lawfulness of the traffic stop because no violation is shown on the recording of the traffic stop.

Porter argues that there was no probable cause or reasonable suspicion to believe that he had committed a traffic offense while driving the vehicle. He contends the Government cannot prove that the traffic stop conducted by Trooper Perry was justified at its inception. He also argues that any incriminating statements he made following his arrest should be suppressed as a result of the unlawful search and seizure.

**Law and Analysis**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 592 Fed. Appx. 246, 250 (5th Cir. 2014); quoting United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Lawful cause to make a traffic stop exists when a defendant commits a traffic violation and a law-enforcement officer observes the violation. United States v. Khanalizadeh, 493 F.3d 479, 482 (5th Cir. 2007).

Neither Porter nor Graves argues that the second prong of Terry is not met, so the court will address only the first prong of the analysis---whether stopping the vehicle was justified at its inception. Trooper Perry testified that the vehicle driven by Porter crossed the right fog line (Tr. 5). The Louisiana Supreme Court has held that crossing the fog line is improper lane usage in violation of La. R.S. 32:79. State v. Waters, 780 So.2d 1053 (La. 2001); United States v. Hernandez, 744 Fed.Appx. 873 (5th Cir. 2018)("Because Hernandez's vehicle briefly touched the fog line, the state trooper had probable cause to believe a traffic violation occurred, and this reasonable suspicion justified the traffic stop at its inception."). See also United States v. Bell-Brayboy, 2017 WL 5078400 (W.D. La. 2017) (Hornsby, J.)

Defendants dispute that there was a violation based on the video of the traffic stop; however, Trooper Perry testified that his dash cam was not activated until after he saw the vehicle commit the violation. Trooper Perry testified that he observed the vehicle commit the traffic violation. His testimony was credible, and there is no evidence to the contrary.

Therefore, the stop was justified at its inception, even if the real reason for the stop was to look for evidence of other crimes. United States v. Cole, 444 F.3d 688, 689 (5th Cir. 2006). Because the stop was lawful, there is no justification for suppressing the evidence or any statements made after the discovery of the narcotics.

Accordingly,

It is recommended that the Motions to Suppress (Docs. 32 and 33) be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 8th day of January, 2019.

Mark L. Hornsby
U.S. Magistrate Judge